J-S73027-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRETT MARTIN PETERS | |
| Appellant | No. 663 MDA 2014 |

Appeal from the PCRA Order of March 17, 2014
In the Court of Common Pleas of Lancaster County
Criminal Division at Nos.: CP-36-CR-0001874-2010
CP-36-CR-0001880-2010

BEFORE:  BOWES, J., WECHT, J., and MUSMANNO, J.

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 18, 2014**

Brett Peters appeals the March 17, 2014 order denying his petition for relief pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-46.  We adopt the PCRA court's comprehensive and well-reasoned opinion, and we affirm.

On January 14, 2011, a jury convicted Peters of rape by forcible compulsion, sexual assault, stalking, and intimidation of a witness with respect to each of these charges.[1]  The PCRA court has summarized the evidence presented at Peters' trial as follows:

In early January 2010, the victim, E.M., broke off a six-year relationship with [Peters].  [Peters] "didn't take it well."  He

---

[1]    18 Pa.C.S. §§ 3121(a)(1), 3124.1, 2709.1(a)(1), and 4952(a)(3) respectively.

called E.M. "incessantly." The victim's billing records showed a 24-hour period during which [Peters] made 288 calls from his land line to the victim's cell phone.

[Peters] also began showing up at E.M.'s place of employment. The first time, he approached E.M. as she entered the front door of the nursing home and threatened, "are you going to talk to me, because if you are not I'm going to call your daughters, and I know where they live." [Peters] did try calling one of the victim's daughters that same afternoon.

The second time [Peters] showed up at E.M.'s place of employment, he ran up to E.M.'s car as she was approaching it and demanded "everything that he had ever given [her] in those six years." E.M. said that she would pack it all up and leave it in her car and [Peters] should come the next day to retrieve it. [Peters] showed up the next day, got the things out of E.M.'s car, went through them and approached E.M. as she left her job and said, "that is not everything." [Peters] then tried to get into E.M.'s car. That evening, E.M. packed up "everything" and left it on [Peters'] porch the next morning on the way to work.

When [Peters] showed up a third time at E.M.'s place of employment, he tried to get into her car as she was leaving and insisted, "[y]ou are going to listen to me." As a result of these encounters at work, E.M. became fearful of [Peters] and began parking her car as close to the front door entrance as possible, and even asked the co-worker whom she was taking home if she could go out after work and get the car and bring it to the door. Four co-workers testified to E.M.'s fear of [Peters].

Because of this fear, E.M. asked her son-in-law to change the locks on her apartment door. Arrangements were made to do the work on Saturday, January 16, 2010. When E.M. came home that Saturday after spending the night at her daughter's house, she found all the clothing which she had returned to [Peters] back in her bedroom closet, which frightened her. E.M.'s son-in-law arrived later in the afternoon and changed the locks on the front door of the apartment as planned. E.M.'s daughter, who had stayed to have dinner with her mother, went out on the patio to smoke a cigarette after dinner and noticed [that] the sliding door was unlocked, which was unusual because E.M. never left it unlocked. E.M.'s daughter became suspicious and tried to open the door to the utility closet on the patio but felt someone on the inside holding the door shut. Eventually,

[Peters] came out of the utility closet. E.M. called 911 as [Peters] fled the apartment.

Ephrata Police Officer Douglas E. Heilman responded to the emergency call. While he was investigating, [Peters] called the apartment and Officer Heilman spoke to him. After admitting to being in the apartment, Officer Heilman warned [Peters] not to have any more contact with E.M., not to call, and not to come to E.M.'s home or place of employment. No charges were filed against [Peters] as a result of this incident.

On January 27, 2010, just before 9:00 p.m., E.M. drove up to her apartment and [Peters] approached her car. [Peters] tried to get E.M. to leave her car but she refused. [Peters] only fled when he heard E.M. calling 911 for help. [Peters] was cited for harassment as a result of this incident and found guilty on April 29, 2010.

Less than two weeks later, on either February 10 or 11, 2010, as E.M. was unlocking the door to her apartment, [Peters] walked out from the bushes beside the house. [Peters] stated that he "wanted to talk" but E.M. refused and entered her apartment. [Peters] left but later called E.M. and left her a voice mail in which he stated: "You know that I love you or I would have gotten in that door." Detective Graeme Quinn, with the Ephrata Police Department, listened to the voice mail, identified the speaker as [Peters], and made a recording of the message, which he played for the jury.

On February 12, 2010, [Peters] sent flowers, a card, and a letter to the victim at her place of employment. The card said: "I love you. Always. Just call or come by. OXOXOXOXOXO BP." The letter stated that [Peters] loved her and was responsible for all the good fortune she had in her life. [Peters] further identified all the material things he had given E.M. during their relationship and offered to pay off her car loan.

That evening, E.M. arrived home from work at approximately 8:30 p.m. As she unlocked the front door, "[Peters] jumped out of the bushes beside the house just beside [E.M.'s] door, . . . and [she] screamed. And he put his hand over [her] mouth, pushed [her] in the door with his hand over [her] mouth . . . pushing and dragging [her] up the steps." He told her: "[You] better keep [your] mouth shut. You're going to talk to me."

Once upstairs, E.M. walked over to the couch, sat down and reached inside her purse for her cell phone. [Peters] grabbed the phone and crushed it. [Peters] threatened to hit E.M. if she screamed. [Peters] then said: "[Y]ou've got two choices. You can suck me off or you can give me what I want." To which, E.M. kicked him with her legs. "And that's when he really became angry and got this look on his face and came at [E.M.] unbuttoning his pants." E.M. looked at [Peters] and said: "[S]o what you're telling me is you are going to rape me?" [Peters'] response was, "well, I gave you a choice." [Peters] then dragged E.M. off the couch onto the floor, pulled her pants down, and inserted his penis into her vagina. E.M. begged [Peters] to go and warned him that her daughter was coming at any moment.[17]

> [17] E.M.'s daughter, A.M., testified that her mother did not feel safe staying in the apartment so A.M. had made plans to spend the night with her.

[Peters] proceeded down the steps and E.M. followed to lock the door behind him. When [Peters] opened the door, E.M. heard a car pull up. As E.M.'s daughter, A.M., approached the door, [Peters] walked out. A.M. found her mother just inside the door, crying. In response to A.M.'s question of "what's wrong, mom," E.M. stated: "He just raped me." A.M. called 911 and then put her mother on to speak with the operator.

Meanwhile, Kassandra Legg, the friend who had driven A.M. to her mother's apartment, observed that as A.M. got out of the car, "a person walked out of [E.M.'s] house and walked towards [Legg's] car to the passenger door and looked like he was going to open the door and then changed his mind and walked to the driver's side and left."

The quality assurance supervisor at the Lancaster County 911 Center testified that a 911 call for an incident that occurred at the home of E.M. in Ephrata of February 12, 2010, came in at 9:03 p.m. Ephrata Police Officer John Hirniesen was dispatched to E.M.'s apartment. Upon his arrival, Officer Hirniesen searched the area with a flashlight looking for [Peters] and discovered a "burrowed out area in the snowbank" big enough for a person to fit into. The officer referred to this area as a "fighting position or a foxhole."

When Officer Hirniesen encountered the victim, he found her to be "quiet, taken back, real removed," and "shaken." The officer

- 4 -

advised E.M. to go to the hospital. A.M. drove her mother, whom she described as "upset [and] scared," to the emergency room at the local hospital, where a sexual assault forensic examination (SAFE) was performed on her. E.M. reported to the SAFE nurse that [Peters] told her: "[Y]ou are either going to suck me off or let me screw you." According to the nurse's notes, "[E.M.] said no and pushed him away. And then he pulled her pants off, got on top of her, and penetrated her with his penis." The examination revealed two small abrasions to the left side of E.M.'s face.

A forensic scientist with the Pennsylvania State Police Crime Laboratory in Harrisburg testified to the presence of spermatozoa in the crotch area of E.M.'s underwear and on the vaginal swabs taken at the hospital. This spermatozoa matched the DNA profile of [Peters].[18] An Ephrata Police Officer processed the crime scene and, with the aid of a forensic light source, found bodily fluids on the carpeting in the area of the sexual assault.

[18] Specifically, the probability of [Peters'] genetic profile match is approximately 1 in 4.3 sextillion from the Caucasian population, approximately 1 in 200 quintillion from the African American population, and approximately 1 in 370 quintillion from the Hispanic population.

On February 13, 2010, [Peters] was arrested and charged with rape by forcible compulsion, sexual assault, stalking and simple assault. [Peters] made bail and was released from prison on February 14, 2010, and ordered not to have any contact with the victim. The following day, [Peters] met up with Gloria Boyer, a co-worker, and explained to her his reasons for missing work over the weekend. [Peters] told Ms. Boyer that E.M. invited him over to talk and have sex, but that he only stayed 30 minutes because E.M.'s daughter was coming over.

Ms. Boyer told [Peters] that her daughter, Sherry Goodley, worked with E.M. and that she (Ms. Goodley) had observed scratches on E.M.'s face following their sexual encounter. [Peters] denied being responsible for those injuries. [Peters] then asked Ms. Boyer to have her daughter relay a message to E.M. The message was that [Peters] would pay off the victim's car loan if she dropped the rape and sexual assault charges against him. The victim received the message from Ms. Goodley on February 16, 2010, and called the Ephrata Police to report the

contact. As a result, on February 19, 2010, [Peters] was arrested a second time and charged with having committed the offense of intimidation of a witness/victim.

[Peters] took the stand in his own defense at trial. He admitted being present on the victim's balcony on January 16, 2010. He steadfastly denied, however, the allegations of rape and sexual assault said to have occurred on February 12, 2010. He offered the following counterpoint to the Commonwealth's rendition of the facts.

On Friday, February 12, 2010, [Peters] was in his house in the City visiting with his female friend, Brook Klinehaus. [Peters'] daughter, Tambra Peters, was also in the house. E.M. arrived at approximately 3:00 p.m., and stayed 25 minutes. During this time, [Peters] and E.M. had sex in an upstairs bedroom. [Peters] presumes that E.M. then returned to work. E.M. stopped back at [Peters'] house between 8:05 and 8:10 p.m. that evening and invited [Peters] to her apartment in Ephrata. [Peters], his daughter, and her two children arrived at E.M.'s apartment 20 to 25 minutes later. They all sat around and talked for about 30 to 35 minutes. During the visit, [Peters] asked E.M. about the flowers that he had delivered to her place of employment that day. E.M. told [Peters] that her daughter was coming over so "that was the key to leave because we don't get along." [Peters] and his daughter and grandchildren then left, without ever seeing E.M.'s daughter, A.M.

[Peters] refuted the victim's assertion that she had been the one to terminate the relationship, insisting that he had broken off things with E.M. in early January 2010. [Peters] persisted in his assertion even after hearing the voice mail message in which he begged E.M. to take him back for whatever he had done and offered to pay off her car if she would only take him back, and after hearing read to him the letter sent with flower on February 12, 2010, in which [Peters] pleaded with E.M. to take him back. [Peters] denied making the 288 calls from his home phone to E.M.'s cell phone, and claimed that his grandchildren placed those calls. [Peters] further denied being at E.M.'s place of employment other than the one time to collect the bags of clothing which he had demanded be returned to him.

[Peters] also firmly denied the allegation relating to the charge of intimidation of a witness/victim. In an effort to discredit his co-worker, Ms. Boyer, [Peters] insinuated that she was

- 6 -

untruthful in her testimony because she had been shunned by [Peters] romantically. [Peters] claimed that it was Ms. Boyer who initiated the conversation by asking "what would you do to get out of that mess." To which, [Peters] responded: "I'd do anything to get out of that mess. . . . I'd even pay off [E.M.'s] car." [Peters asserted] that it was Ms. Boyer who made the decision to pass that information on to E.M. through her daughter.

PCRA Court Opinion ("P.C.O."), 3/17/2014, at 12-20 (citations to notes of testimony omitted).

On May 5, 2011, following Peters' jury trial convictions of the above-referenced offenses, Peters was sentenced to an aggregate term of incarceration of thirteen and one-half to thirty-two years. However, Peters subsequently was resentenced to thirteen to thirty-two years' incarceration because of a miscalculation in his prior record score.

We affirmed Peters' judgment of sentence on direct appeal. *See* *Commonwealth v. Peters*, No. 2071 MDA 2011, slip op. at 1, 11 (Pa. Super. Sep. 7, 2012). Peters did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.

On March 13, 2013, Peters filed a *pro se* PCRA petition. The PCRA court appointed counsel, who filed an amended PCRA petition on Peters' behalf. Following a response by the Commonwealth, the PCRA court held an evidentiary hearing on Peters' PCRA claims. At the conclusion of the hearing, the PCRA court directed the parties to file briefs in support of their respective positions. On March 17, 2014, the PCRA court issued an order and a corresponding opinion denying Peters' PCRA petition.

On April 14, 2014, Peters filed a notice of appeal. The PCRA court did not direct Peters to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Peters did not file one. Also, the PCRA court did not issue an opinion pursuant to Pa.R.A.P. 1925(a). However, the court thoroughly addressed Peters' claims in its March 17, 2014 opinion that the court issued in support of its order denying PCRA relief. Thus, the court's failure to file a Rule 1925(a) opinion does not hinder our ability to review Peters' claims.

Peters raises two issues for our review:

1. Did the PCRA court err in determining that [Peters] was not deprived of the effective assistance of counsel when trial counsel failed to call witnesses at trial?

2. Did the PCRA court err in determining that [Peters] was not deprived of the effective assistance of counsel when trial counsel failed to utilize the services of a private investigator?

Brief for Peters at 4.

We review a PCRA court's order to determine whether the order is "supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." *Commonwealth v. Garcia*, 23 A.3d 1059, 1061 (Pa. Super. 2011) (citation omitted).

Both of Peters' claims challenge the effectiveness of his trial counsel, which implicates the following well-established standard:

[I]n order to obtain relief based on [a claim of ineffective assistance of counsel], a petitioner must establish: (1) the

- 8 -

underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.

*Commonwealth v. Reed*, 971 A.2d 1216, 1224 (Pa. 2005) (citing *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987)). The petitioner bears the burden of proving all three prongs of this test. *Commonwealth v. Meadows*, 787 A.2d 312, 319-20 (Pa. 2001).

We also note that, in his first claim, Peters alleges that trial counsel was ineffective for failing to call various witnesses at trial. To succeed on such a claim, a petitioner must demonstrate the following: (1) the witness was available to testify; (2) counsel knew, or had a duty to know, of the existence of the witness; (3) the witness was willing and able to "cooperate and appear on behalf of the defendant"; and (4) the testimony must have been necessary in order to avoid prejudice. *Commonwealth v. Priovolos*, 715 A.2d 420, 422 (Pa. 1998). "As [an a]ppellant's trial counsel is presumed to have rendered him effective assistance, he will not be deemed ineffective for failing to call . . . witnesses based solely on [a]ppellant's unsubstantiated allegations concerning the witnesses' existence and willingness to testify on his behalf." *Commonwealth v. Lopez*, 739 A.2d 485, 496 (Pa. 1999); *see also Commonwealth v. Walls*, 993 A.2d 289, 302 (Pa. Super. 2010) (applying same standard to expert witnesses).

We have reviewed the parties' respective briefs, including the arguments and citations to legal authority contained therein. More

importantly, we have reviewed the record and the applicable law, including those general provisions set forth above. Having done so, we conclude that the PCRA court correctly denied Peters' PCRA petition. Furthermore, we adopt the PCRA court's thorough, well-supported March 17, 2014 opinion as our own. Therein, the court set forth a highly detailed recitation of the factual and procedural history. More importantly, the court reviewed each of Peters' claims, most notably those that Peters' raises herein, **see** P.C.O. at 23-30, 30-34, and comprehensively reviewed the factual and legal bases for each of those claims before concluding that they did not warrant relief. Having reviewed the PCRA court's opinion, we have nothing to add that would necessitate any additional analysis. Therefore, we adopt the PCRA court's opinion as our own, and affirm the court's order denying Peters' PCRA petition. A copy of the PCRA court's opinion is attached hereto for convenience.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/18/2014

- 10 -

## IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
## C R I M I N A L

COMMONWEALTH OF PENNSYLVANIA :
:
v. : Nos. 1874-2010 and 1880-2010
:
BRETT MARTIN PETERS :


## O P I N I O N

BY:   ASHWORTH, J., MARCH 17, 2014

Brett Martin Peters has filed an amended petition pursuant to the Post

Conviction Relief Act (PCRA), 42 Pa. C.S.A. §§ 9541-9546. For the reasons set forth

below, this Petition will be denied following a hearing on October 26, 2013.

### I.   Procedural Background

On February 13, 2010, Petitioner was arrested and charged with having

committed the offenses of rape by forcible compulsion, sexual assault, stalking and

simple assault[1] against his former girlfriend. These offenses, which were eventually

docketed at Information No. 1874-2010, occurred between January 16, 2010, and

February 12, 2010. Petitioner was arraigned on February 14, 2010, and sent to

Lancaster County Prison on $100,000.00 bail and ordered not to have any contact with

the victim. Petitioner made bail and was released from prison on February 14, 2010.

---

[1]18 Pa. C.S.A. § 3121(A)(1), 18 Pa. C.S.A. § 3124.1, 18 Pa. C.S.A. § 2709.1(a)(1), and
18 Pa. C.S.A. § 2701(A)(3), respectively.

That same day, Petitioner passed a message to the victim through a co-worker and her daughter that Petitioner would pay off the victim's car loan and leave her alone forever if she dropped the rape and sexual assault charges against him. The victim reported the contact to the police and on February 19, 2010, Petitioner was arrested and charged with having committed the offense of intimidation of a witness or victim.[2] This offense was eventually docketed at Information No. 1880-2010. Bail was set in the amount of $400,000.00 and Petitioner was incarcerated in lieu of bail on February 22, 2010.

A preliminary hearing was held on both sets of charges on April 29, 2010, and all counts were returned to the Lancaster County Court of Common Pleas. At that hearing, Petitioner was represented by private counsel, Robert H. Reese, Jr., Esquire.

Petitioner's formal arraignment on these charges was held on May 26, 2010. At that time, Petitioner appeared *pro se* and it was communicated that Petitioner wished to have a Public Defender appointed to represent him.[3] (*See* Motion to Withdraw as Counsel at ¶ 7.) On May 27, 2010, an investigator for the Public Defender's Office informed the Office of the Bail Administration and Pre-Trial Services of this communication and requested that Petitioner be assigned counsel. (Id. at ¶ 8.)

On June 15, 2010, Assistant Public Defender Andrew E. Spade, Esquire, entered his appearance on behalf of Petitioner. Thereafter, Petitioner made several

---

[2]18 Pa. C.S.A. § 4952(A)(3).

[3]Apparently, Petitioner "fired" Mr. Reese and brought "legal charges" against him because he "did not like the way Robert Reese treated [him] and because "[Reese] lied to [him]." (Notes of Testimony ("N.T."), Motion to Withdraw Hearing at 6-7.)

2

communications to the Public Defender's Office questioning this assignment of counsel. (*See* Motion to Withdraw as Counsel at ¶ 10.) Additionally, Petitioner made multiple communications with the District Attorney's Office, the Clerk of Courts Office, and the Court in an attempt to represent himself. (Id. at ¶ 11.) On July 29, 2010, Petitioner informed counsel that he did not wish to have counsel's representation but rather desired to represent himself. (Id. at ¶¶ 14-15.) Further, Petitioner denied ever having made a request for appointment of counsel. (Id. at ¶ 17.)

Upon request of Petitioner, on August 4, 2010, Attorney Spade filed a motion to withdraw due to "[Petitioner's] lack of cooperation, stated distrust of counsel, request that counsel no longer represent him and [Petitioner's] ongoing attempts to represent himself." (*See* Motion to Withdraw as Counsel at ¶ 21.) A hearing was held on the motion on August 17, 2010. At that time, after a thorough waiver colloquy in accordance with Pa. R.Crim.P. 121, President Judge Joseph C. Madenspacher granted the motion but appointed Attorney Spade as "stand-by counsel" to Petitioner.[4] (*See* N.T., Motion to Withdraw Hearing at 23, 30.) By Order entered August 24, 2010, these cases were set for trial on January 10, 2011, by President Judge Madenspacher.[5]

---

[4]The President Judge relied upon Pa. R.Crim.P. 121(D), which provides in pertinent part: "When the defendant's waiver of counsel is accepted, standby counsel may be appointed for the defendant. Standby counsel shall attend the proceedings and shall be available to the defendant for consultation and advice." Pa. R.Crim.P. 121(D).

[5]At the hearing on Attorney Spade's motion to withdraw, President Judge Madenspacher specifically asked Petitioner when he would be ready to proceed to trial. (N.T., Motion to Withdraw Hearing at 18.) After some discussion (Id. at 19-22), Petitioner agreed to a January 11, 2011, trial date with the proviso that if he was not prepared he could request "one more continuance" from the Court. (Id. at 21, 23.)

3

Apparently, after having been advised by the Court that private counsel would only be appointed if a conflict of interest existed with the Public Defender's Office, Petitioner alleged such a conflict with "stand-by counsel" Attorney Spade in his *pro se* motion to reduce bail filed on November 30, 2010. (*See* November 30, 2010, "Motion to Reduce Bail" at ¶ 3.) Accordingly, in an effort to protect the due process rights of Petitioner, President Judge Madenspacher entered an Order on December 9, 2010, appointing Attorney Mark Walmer to represent Petitioner on these charges. (*See* Order of December 9, 2010; *see also* Order of December 15, 2010.)

On December 20, 2010, Attorney Walmer filed a "motion for nominal bail pursuant to Rule 600" and "motion of bail reduction pursuant to Rule 600" on behalf of his client. These motions were denied by President Judge Madenspacher on December 21, 2010.[6] That same day, Petitioner filed a *pro se* "motion for filing criminal complaint" in which he objected to Attorney Walmer's representation of him. Petitioner stated that at the time of the August 17, 2010, hearing with President Judge Madenspacher on Attorney Spade's motion to withdraw as counsel, Petitioner asked for another attorney but the Court denied his request. (*See* Petitioner's December 21, 2010, "Motion for Filing Criminal Complaint" at ¶¶ 4-5.) He then claimed that after having been denied new counsel "35 times," Mark Walmer was finally appointed on December 9, 2010, which allowed insufficient time for counsel to prepare for trial

---

[6]The 180-day run date for purposes of Pa. R.Crim.P. 600 would have been August 22, 2010. However, at the August 17, 2010, hearing on Attorney Spade's motion to withdraw, Petitioner asked for and received a four-month continuance to prepare for trial. (N.T., Motion to Withdraw Hearing at 19-23.) Thus, the time from August 17, 2010, through January 10, 2011, was on Petitioner. Accordingly, there was no violation of Rule 600.

4

scheduled for January 10, 2011. (Id. at ¶¶ 7-8, 11) (emphasis in original).) No action was taken on this *pro se* motion, which was forwarded to defense counsel.[7]

On December 31, 2010, the Commonwealth gave notice of its intent to introduce at trial evidence of prior bad acts pursuant to Pa. R.E. 404(b)(4). Specifically, the Commonwealth argued that evidence of police contact in the month prior to the alleged rape was relevant and necessary to prove the element of forcible compulsion and to explain the chain or sequence of events which formed the history of the case and its natural development. Defense counsel responded on January 10, 2011, with a motion to sever the charges of intimidation of a witness and stalking from the trial on rape, sexual assault and simple assault, or in the alternative, to disallow evidence of prior bad acts. This motion was addressed on the record just prior to the start of trial. (N.T., Trial at 4-12.) Based upon the case law and the particular facts of this case, I ruled that the charges would not be severed and that the Commonwealth would be permitted to introduce evidence of prior bad acts to establish a course of conduct that was both probative and relevant to all of the charges that were pending against Petitioner. (Id. at 17-18.)

Petitioner also filed two motions in limine. One sought to exclude all evidence of Petitioner's prior criminal history, which was granted. (N.T., Trial at 16-17.) The other

---

[7]If conflict counsel had believed that he was unable to prepare for trial in the allotted time, he would have requested a continuance. Instead, counsel filed appropriate and timely pre-trial motions and appeared the first day of trial prepared and ready to proceed. Moreover, there was no effort by the Court to "push" this case to trial, as suggested by Petitioner. (*See* Petitioner's December 21, 2010, Motion for Filing Criminal Complaint at ¶ 12.) As discussed, *supra*, there was no impending Rule 600 date because of Petitioner's request for a continuance from August 2010 to January 2011.

5

defense motion requested that certain physical evidence relating to the intimidation of a witness charge not be admitted. This also was granted. (Id. at 17.)

Prior to the start of trial on January 10, 2011, defense counsel also made several oral motions as requested by Petitioner. First was a motion for recusal. (N.T., Trial at 18.) As the reason for this motion, Petitioner explained that he did not agree with a prior ruling I had made on November 24, 2010, denying Petitioner's November 19, 2010, *pro se* "motion for bail reduction." (Id. at 20.) As explained to Petitioner, simply because he did not like my ruling did not mean that I could not or would not be fair and impartial. Petitioner's recusal motion was denied. (Id. at 21.)

Next, Petitioner motioned for a change of venue. (N.T., Trial at 18.) Petitioner's contention was that "he [couldn't] get a fair trial in Lancaster County because of the ongoing nature of the denials of the petitions that he ha[d] filed throughout the past 11 months." (Id. at 23.) Venue will only be changed "when it is determined after hearing that a fair and impartial trial cannot be [sic] otherwise be had in the county where the case is currently pending." Pa.R.Crim.P. 584(A). Because the jury would not be aware of the fact that Petitioner filed pre-trial motions or of the court's rulings on those motions, I determined that a fair and impartial trial was achievable in Lancaster County. Accordingly, Petitioner's motion for change of venue was denied. (Id. at 25.)

Petitioner also orally renewed his request for a psychiatric evaluation. (N.T., Trial at 18, 43.) Prior to trial, Petitioner had requested a psychiatric evaluation for purposes of determining competency, and the Court authorized it. (*See* Motion for Psychiatric Evaluation at ¶ 12.) However, counsel was unable to secure the services of a psychiatrist prior to the scheduled trial date of January 10, 2010. (N.T., Trial at 43-

6

44.) The Court questioned Petitioner regarding this request, and Petitioner indicated that he would rather proceed to trial than to continue the case; thus, the request for a psychiatric evaluation was withdrawn the first day of trial.[8] (Id. at 44-45, 47.)

Lastly, Petitioner requested that his attorney place on the record, prior to the start of trial, the fact that "[Petitioner] wishes that a Court-appointed private investigator had been appointed to help with the investigation of this case." (N.T., Trial at 43; see also Id. at 18.) Again, as it was Petitioner's preference not to delay the trial in this matter, the request was withdrawn. (Id. at 44-45.)

The consolidated cases[9] proceeded to trial before the undersigned on January 10, 2011, and concluded on January 14, 2011, with a jury verdict of guilty on all counts[10] (except for the simple assault charge which had been reserved by the

---

[8]The Pennsylvania Mental Health Procedures Act provides that a defendant is legally Incompetent if he is "substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense." 50 P.S. § 7402(a). In considering competency, the trial court must keep in mind that "the focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings." **Commonwealth v. Starr**, 541 Pa. 564, 589, 664 A.2d 1326, 1339 (1995) (*quoting* **Godinez v. Moran**, 509 U.S. 389, 401 n.12 (1993) (emphasis in original)). This Court observed Petitioner in the courtroom and had no reason to doubt Petitioner's ability to understand what was happening to him and why he was in court. Having been involved in other cases in which a competency evaluation was conducted, here there was absolutely no indication that an inquiry as to Petitioner's competency was necessary. Petitioner appeared at all times to possess the ability to understand what was going on and the nature of the charges in this case. The case law is well settled that a competency determination Is necessary *only* when a trial court has reason to doubt the defendant's ability to understand the proceedings. **Starr**, 541 Pa. at 589-90, 664 A.2d at 1339 (*citing* **Godinez**, 509 U.S. at 401 n.13). In this case, there was no need for a searching inquiry of Petitioner's then-existing mental health.

[9]On May 14, 2010, the Commonwealth gave notice, pursuant to Pa. R.Crim.P. 582(B)(1), of its intent to consolidate these cases for purposes of trial.

[10]Petitioner was found guilty of rape by forcible compulsion, sexual assault, stalking, and intimidation of a victim with respect to the charges of stalking, rape and sexual assault, and was found to have offered the victim pecuniary or other benefit.

7

Commonwealth for *nolle pros* at time of sentencing). (*See* N.T., Trial at 61). Following the guilty verdict, the Court ordered a pre-sentence investigation report. Having been found guilty of multiple Megan's Law offenses, *see* 42 Pa. C.S.A. § 9791 *et seq.*, Petitioner was ordered to undergo an evaluation by the Pennsylvania Sexual Offender's Assessment Board for purposes of determining whether he qualified as a sexually violent predator. (*See* Order of January 18, 2011.)

On March 3, 2011, defense counsel requested a court-appointed psychiatric evaluation of Petitioner to aid in his sentencing. (*See* Motion of March 3, 2011.) This request was granted by Order entered on March 4, 2011. Jerome I. Gottlieb, M.D., appeared at the Lancaster County Prison to evaluate Petitioner but Petitioner refused to participate in the evaluation without his attorney being present. (N.T., Sentencing at 3; N.T., PCRA at 45.)

The Commonwealth notified the Court, by letter dated March 23, 2011, that the Sexual Offender's Assessment Board had determined that Petitioner did not meet the criteria of a sexually violent predator. Accordingly, Petitioner's sentencing was scheduled for May 5, 2011, at which time Petitioner received an aggregate sentence of 13-1/2 to 32 years' incarceration.[11] Petitioner was also made subject to the reporting requirements of Megan's Law, 42 Pa. C.S.A. § 9795.1(b) and § 9795.2.

Petitioner, through court-appointed counsel, Mark Walmer, filed a timely post-sentence motion challenging the alleged intimidation by the Court of a defense witness,

---

[11]Petitioner received consecutive sentences of 7-1/2 to 20 years for the rape by forcible compulsion, 1 to 2 years for the stalking, and 5 to 10 years for the intimidation of a witness. The sexual assault charge merged for sentencing purposes. The simple assault charge was *nolle prossed.*

8

and the Court's alleged abuse of discretion in making Petitioner's sentences consecutive rather than concurrent. Defense counsel also presented the nine alleged trial court errors that Petitioner insisted be raised post sentence: (1) "Appointment of Trial Counsel 30 Days Prior to Trial"; (2) "Rule 600 Violation"; (3) "Motion to Sever Trial of the Charges"; (4) "Motion to Sever Charges"; (5) "Motion for Change of Venue"; (6) "Motion for Recusal"; (7) "Exclusion of Testimony"; (8) "Failure to Appoint Investigator"; and (9) "Failure to Order a Psychiatric Examination Prior to Trial."

Included with Petitioner's post sentence motions was a motion to withdraw by defense counsel. By Order entered on May 16, 2011, this Court granted Attorney Walmer's request to withdraw upon the filing of the entry of appearance by the Public Defenders' Office.

An amended post sentence motion was filed on July 12, 2011, by Petitioner's newly appointed public defender. In this motion, Petitioner withdrew the motion for new trial based upon the alleged intimidation by the Court of a defense witness, the motion challenging abuse of discretion in sentencing, and the section entitled "additional errors of trial court."[12] Included in the motion was a request for resentencing due to the improper calculation of the sentencing guidelines. Specifically, Petitioner's prior record score had been incorrectly calculated based upon seven prior misdemeanor convictions, rather than five. Accordingly, with the agreement of the Commonwealth,

---

[12]In withdrawing these motions and alleged errors from the post sentence motion, defense counsel noted that such action did not "signify that none of the issues raised therein will be raised on appeal. Rather, this action merely signifies that no Post Sentence Motion is needed to preserve said issues" for direct appeal. (See Amended Post Sentence Motion at 1.)

9

Petitioner's sentence was vacated on August 23, 2011, and a new sentencing hearing was scheduled for November 4, 2011.

Prior to the resentencing, Petitioner filed another motion for psychiatric evaluation pursuant to Pa. R.Crim.P. 702(B), to aid in imposing sentence. In counsel's presence, Dr. Gottlieb performed a comprehensive forensic psychiatric evaluation of Petitioner and determined that Petitioner was competent to stand for sentencing. He further diagnosed Petitioner as suffering from depression and feelings of abandonment and victimization.

On November 4, 2011, this Court imposed consecutive sentences of 7 to 20 years for the rape by forcible compulsion, 1 to 2 years for the stalking, and 5 to 10 years for the intimidation of a witness. The sexual assault merged for sentencing purposes and the simple assault charge was *nolle prossed*.

A timely notice of appeal to the Superior Court of Pennsylvania from the judgment of sentence was filed on November 18, 2011.[13] On November 28, 2011, privately-retained counsel, Robert L. Baroska, III, Esquire, and Jonathan W. Crisp, Esquire, entered their appearance on behalf of Petitioner. Accordingly, the Public Defender's Office subsequently withdrew its appearance on December 9, 2011.

---

[13]Pursuant to this Court's directive, Petitioner furnished a statement of errors complained of on appeal which raised three issues: (1) "The trial court denied Petitioner's fundamental right to due process, specifically, the presumption of innocence, when the jury was permitted to view the Petitioner shackled and the trial [court] improperly denied his timely request for a mistrial"; (2) "Petitioner was denied equal access to witnesses as guaranteed under [the] 6th Amendment U.S. Const[.] when the trial judge, without provocation and *sua sponte*, chastised a defense witness as to the penalties to perjury thereby chilling her participation in the trial and failed to similarly chastise any Commonwealth witnesses"; and (3) "The trial court had a *sua sponte* obligation to colloquy the witness the trial court had previously instructed on the penalties of perjury as to why she chose not to testify when the trial court previously implied she was going to testify untruthfully." (*See* Statement of Matters at ¶¶ 1-3.)

10

On September 7, 2012, a three-judge panel of the Superior Court affirmed the judgment of sentence in an unpublished memorandum. No petition for allowance of appeal was filed with the Supreme Court of Pennsylvania.

On March 13, 2013, Petitioner, acting *pro se*, filed a motion for post conviction collateral relief.[14] In this pleading, Petitioner raised claims relating to ineffective assistance of counsel and a violation of the Constitution which so undermined the truth-determining process that no reliable adjudication of guilty or innocence could have taken place. Pursuant to Rule 904(A) of the Pennsylvania Rules of Criminal Procedure, Michael V. Marinaro, Esquire, was appointed on March 20, 2013, to represent Petitioner on his collateral claims and was granted leave to file an amended petition.

On May 20, 2013, an amended petition was filed in which Appellant raises seven claims of ineffective assistance by his trial counsel. The Commonwealth filed a response on June 14, 2013, conceding the need for an evidentiary hearing on these claims. A hearing was held on October 26, 2013,[15] at which time the Court heard testimony from Petitioner and Attorney Walmer. Briefs having been filed by the parties,[16] this matter is ripe for disposition.

---

[14]The pleading is deemed filed on the date of mailing, March 13, 2013, rather than the date of docketing, March 15, 2013, pursuant to the "prisoner mailbox rule." **Commonwealth v. Crawford,** 17 A.3d 1279, 1281 (Pa. Super. 2011) ("Under the prisoner mailbox rule, we deem a *pro se* document filed on the date it is placed in the hands of prison authorities for mailing.").

[15]The hearing was originally scheduled for August 8, 2013, but was continued to October 2, 2013, due to the unavailability of a witness. The hearing on October 2, 2013, was continued because Petitioner was moved to another state correctional institution and a new writ could not be obtained in a timely fashion.

[16]Petitioner's unopposed motion for extension of time to file his brief was granted on December 13, 2013. The Commonwealth's unopposed application for extension of time to file a brief in opposition was granted on February 6, 2014.

11

## II.    Factual Background

The evidence at trial established the following facts. In early January 2010, the victim, E.M., broke off a six-year relationship with Petitioner. (N.T., Trial at 93-94, 98-99.) Petitioner "didn't take it well." (Id. at 100.) He called E.M. "incessantly." (Id. at 100, 107-08.) The victim's billing records showed a 24-hour period during which Petitioner made 288 calls from his land line to the victim's cell phone. (Id. at 268, 279; see also 108, 138-39, 285-86, 425, 492-93; Comm. Exs. 17, 27 & 28.)

Petitioner also began showing up at E.M.'s place of employment. (N.T., Trial at 92, 102.) The first time, he approached E.M. as she entered the front door of the nursing home and threatened, "are you going to talk to me, because if you are not I'm going to call your daughters, and I know where they live." (Id. at 102.) Petitioner did try calling one of the victim's daughters that same afternoon. (Id. at 156-57.)

The second time Petitioner showed up at E.M.'s place of employment, he ran up to E.M.'s car as she was approaching it and demanded "everything that he had ever given [her] in those six years." (N.T., Trial at 105.) E.M. said she would pack it all up and leave it in her car and Petitioner should come the next day to retrieve it. (Id. at 105.) Petitioner showed up the next day, got the things out of E.M.'s car, went through them and approached E.M. as she left her job and said, "that is not everything." (Id. at 106.) Petitioner then tried to get into E.M.'s car. (Id. at 107.) That evening, E.M. packed up "everything" and left it on Petitioner's porch the next morning on her way to work. (Id. at 106.)

12

When Petitioner showed up a third time at E.M.'s place of employment, he tried to get into her car as she was leaving and insisted, "[y]ou are going to listen to me." (N.T., Trial at 107.) As a result of these encounters at work, E.M. became fearful of Petitioner and began parking her car as close to the front door entrance as possible (Id. at 104-05), and even asked the co-worker whom she was taking home if she could go out after work and get the car and bring it to the door. (Id. at 105.) Four co-workers testified to E.M.'s fear of Petitioner. (Id. at 257-58, 260, 263-65, 393-94.)

Because of this fear, E.M. asked her son-in-law to change the locks on her apartment door. (N.T., Trial at 108-09; see also Id. at 252-53, 256.) Arrangements were made to do the work on Saturday, January 16, 2010. (Id. at 108-09.) When E.M. came home that Saturday after spending the night at her daughter's house, she found all the clothing which she had returned to Petitioner back in her bedroom closet, which frightened her. (Id. at 109.) E.M.'s son-in-law arrived later in the afternoon and changed the locks on the front door of the apartment as planned. (Id. at 109-10, 253.) E.M.'s daughter, who had stayed to have dinner with her mother, went out on the patio to smoke a cigarette after dinner and noticed the sliding door was unlocked, which was unusual because E.M. never left it unlocked. (Id. at 110, 242-43.) E.M.'s daughter became suspicious and tried to open the door to the utility closet on the patio but felt someone on the inside holding the door shut. (Id. at 111, 243.) Eventually, Petitioner came out of the utility closet. E.M. called 911 as Petitioner fled the apartment. (Id.)

Ephrata Police Officer Douglas E. Heilman responded to the emergency call. (N.T., Trial at 112, 193.) While he was investigating, Petitioner called the apartment and Officer Heilman spoke to him. (Id. at 112, 195.) After admitting to being in the

13

apartment, Officer Heilman warned Petitioner not to have any more contact with E.M., not to call, and not to come to E.M.'s home or place of employment. (Id. at 195.) No charges were filed against Petitioner as a result of this incident. (Id. at 113.)

On January 27, 2010, just before 9:00 p.m., E.M. drove up to her apartment and Petitioner approached her car. (N.T., Trial at 113.) Petitioner tried to get E.M. to leave her car but she refused. (Id. at 113, 114.) Petitioner only fled when he heard E.M. calling 911 for help. (Id. at 114.) Petitioner was cited for harassment as a result of this incident and found guilty on April 29, 2010. (Id. at 200, 203.)

Less than two weeks later, on either February 10 or 11, 2010, as E.M. was unlocking the door to her apartment, Petitioner walked out from the bushes beside the house. (N.T., Trial at 115.) Petitioner stated that he "wanted to talk" but E.M. refused and entered her apartment. (Id.) Petitioner left but later called E.M. and left her a voice mail in which he stated: "You know that I love you or I would have gotten in that door." (Id.) Detective Graeme Quinn, with the Ephrata Police Department, listened to the voice mail, identified the speaker as Petitioner, and made a recording of the message, which he played for the jury. (Id. at 422, 426-27; Comm. Ex. 43.)

On February 12, 2010, Petitioner sent flowers, a card, and a letter to the victim at her place of employment. (N.T., Trial at 132-33, 141-42, 429-30; Comm. Exs. 16, 18, & 44.) The card said: "I love you. Always. Just call or come by. OXOXOXOXOXO BP." (Id. at 134; Comm. Ex. 16.) The letter stated that Petitioner loved her and was responsible for all the good fortune she had in her life. (Id. at 135-36; Comm. Ex. 18.) Petitioner further identified all the material things he had given E.M. during their relationship and offered to pay off her car loan. (Id. at 136; Comm. Ex. 18.)

14

That evening, E.M. arrived home from work at approximately 8:30 p.m. (N.T., Trial at 116.) As she unlocked the front door, "[Petitioner] jumped out of the bushes beside the house just beside [E.M.'s] door, . . . and [she] screamed. And he put his hand over [her] mouth, pushed [her] in the door with his hand over [her] mouth . . . pushing and dragging [her] up the steps." (Id.) He told the victim: "[You] better keep [your] mouth shut. You're going to talk to me." (Id.)

Once upstairs, E.M. walked over to the couch, sat down and reached inside her purse for her cell phone. (N.T., Trial at 117.) Petitioner grabbed the phone and crushed it. (Id. at 117, 130; Comm. Exs. 5 & 11.) Petitioner threatened to hit E.M. if she screamed. (Id. at 118.) Petitioner then said: "[Y]ou've got two choices. You can suck me off or you can give me what I want." (Id.) To which, E.M. responded by kicking him with her legs. (Id.) "And that's when he really became angry and got this look on his face and came at [E.M.] unbuttoning his pants." (Id.) E.M. looked at Petitioner and said: "[S]o what you're telling me is you are going to rape me?" (Id. at 119.) Petitioner's response was, "well, I gave you a choice." (Id.) Petitioner then dragged E.M. off the couch onto the floor, pulled her pants down, and inserted his penis into her vagina. (Id.) E.M. begged Petitioner to go and warned him that her daughter was coming at any moment.[17] (Id.)

Petitioner proceeded down the steps and E.M. followed to lock the door behind him. (N.T., Trial at 121.) When Petitioner opened the door, E.M. heard a car pull up. (Id.) As E.M.'s daughter, A.M., approached the door, Petitioner walked out. (Id. at 121,

---

[17]E.M.'s daughter, A.M., testified that her mother did not feel safe staying in the apartment so A.M. had made plans to spend the night with her. (N.T., Trial at 241, 243-44.)

15

244.) A.M. found her mother just inside the door, crying. (Id. at 245.) In response to A.M.'s question of "what's wrong, mom," E.M. stated: "He just raped me." (Id. at 245.) A.M. called 911 then put her mother on to speak to the operator. (Id. at 122, 245.)

Meanwhile, Kassandra Legg, the friend who had driven A.M. to her mother's apartment, observed that as A.M. got out of the car, "a person walked out of [E.M.'s] house and walked towards [Legg's] car to the passenger door and looked like he was going to open the door and then changed his mind and walked to the driver's side and left." (N.T., Trial at 287-88.)

The quality assurance supervisor at the Lancaster County 911 Center testified that a 911 call for an incident that occurred at the home of E.M. in Ephrata on February 12, 2010, came in at 9:33 p.m. (N.T., Trial at 293-94, 296; Comm. Ex. 29.) Ephrata Police Officer John Hirniesen was dispatched to E.M.'s apartment. (Id. at 297.) Upon his arrival, Officer Hirniesen searched the area with a flashlight looking for Petitioner and discovered "a burrowed out area in the snowbank" big enough for a person to fit into. (Id. at 301; see also Id. at 313; Comm. Exs. 30 & 31.) The officer referred to this area as a "fighting position or a foxhole." (Id.)

When Officer Hirniesen encountered the victim, he found her to be "quiet, taken back, real removed," and "shaken." (N.T., Trial at 298.) The officer advised E.M. to go to the hospital. (Id. at 303.) A.M. drove her mother, whom she described as "upset [and] scared," to the emergency room at a local hospital, where a sexual assault forensic examination (SAFE) was performed on her. (Id. at 122, 245-46, 303; see also Id. at 210, 217; Comm. Ex. 23.) E.M. reported to the SAFE nurse that Petitioner told her: "[Y]ou are either going to suck me off or let me screw you." (Id. at 205-06, 211.)

16

According to the Nurse's notes, "[E.M.] said no and pushed him away. And then he pulled her pants off, got on top of her, and penetrated her with his penis." (Id. at 211.) The examination revealed two small abrasions to the left side of E.M.'s face. (Id. at 128-29, 214, 216; Comm. Exs. 8, 9, 12 & 22.)

A forensic scientist with the Pennsylvania State Police Crime Laboratory in Harrisburg testified to the presence of spermatozoa in the crotch area of E.M.'s underwear and on the vaginal swabs taken at the hospital. (N.T., Trial at 367, 373-74; Comm. Ex. 39.) This spermatozoa matched the DNA profile of Petitioner.[18] (Id. at 410, 420; Comm. Ex. 41.) An Ephrata Police Officer processed the crime scene and, with the aid of a forensic light source, found bodily fluids on the carpeting in the area of the sexual assault. (Id. at 307-08, 321-22.)

On February 13, 2010, Petitioner was arrested and charged with rape by forcible compulsion, sexual assault, stalking and simple assault. Petitioner made bail and was released from prison on February 14, 2010, and ordered not to have any contact with the victim. The following day, Petitioner met up with Gloria Boyer, a co-worker, and explained to her his reasons for missing work over the weekend. (N.T., Trial at 380-81, 384.) Petitioner told Ms. Boyer that E.M. invited him over to talk and have sex, but that he only stayed 30 minutes because E.M.'s daughter was coming over. (Id. at 382, 387.)

Ms. Boyer told Petitioner that her daughter, Sherry Goodley, worked with E.M. and that she (Ms. Goodley) had observed scratches on E.M.'s face following their

[18]Specifically, the probability of Petitioner's genetic profile match is approximately 1 in 4.3 sextillion from the Caucasian population, approximately 1 in 200 quintillion from the African-American population, and approximately 1 in 370 quintillion from the Hispanic population. (N.T., Trial at 419-20; Comm. Exs. 41 & 42.)

17

sexual encounter. (N.T., Trial at 383-84; *see also* Id. at 393-94.) Petitioner denied being responsible for those injuries. (Id. at 384.) Petitioner then asked Ms. Boyer to have her daughter relay a message to E.M. (Id. at 383.) The message was that Petitioner would pay off the victim's car loan if she dropped the rape and sexual assault charges against him. (Id.) The victim received the message from Ms. Goodley on February 16, 2010 (Id. at 393), and called the Ephrata Police to report the contact. As a result, on February 19, 2010, Petitioner was arrested a second time and charged with having committed the offense of intimidation of a witness/victim. (Id. at 432.)

Petitioner took the stand in his own defense at trial. He admitted being present on the victim's balcony on January 16, 2010. (N.T., Trial at 483, 493-94.) He steadfastly denied, however, the allegations of rape and sexual assault said to have occurred on February 12, 2010. (Id. at 490.) He offered the following counterpoint to the Commonwealth's rendition of the facts.

On Friday, February 12, 2010, Petitioner was in his house in the City visiting with his female friend, Brook Klinehaus. (N.T., Trial at 484.) Petitioner's daughter, Tambra Peters, was also in the house. (Id.) E.M. arrived at approximately 3:00 p.m., and stayed 25 minutes. (Id.) During this time, Petitioner and E.M. had sex in an upstairs bedroom. (Id.) Petitioner presumes that E.M. then returned to work. (Id. at 485.) E.M. stopped back at Petitioner's house between 8:05 and 8:10 p.m. that evening and invited Petitioner to her apartment in Ephrata. (Id.) Petitioner, his daughter, and her two children arrived at E.M.'s apartment about 20 to 25 minutes later. (Id.) They all sat around and talked for about 30 to 35 minutes. (Id. at 485-86.) During the visit, Petitioner asked E.M. about the flowers that he had had delivered to her place of

18

employment that day. (Id. at 486; *see also* Id. at 499.) E.M. told Petitioner that her daughter was coming over so "that was the key to leave because we don't get along." (Id. at 488.) Petitioner and his daughter and grandchildren then left, without ever seeing E.M.'s daughter, A.M. (Id. at 488, 496.)

Petitioner refuted the victim's assertion that she had been the one to terminate their relationship, insisting that he had broken things off with E.M. in early January 2010. (N.T., Trial at 479, 491, 497.) Petitioner persisted in his assertion even after hearing the voice mail message in which he begged E.M. to take him back for whatever he had done and offered to pay off her car if she would only take him back (Id. at 491), and after hearing read to him the letter sent with the flowers on February 12, 2010, in which Petitioner pleaded with E.M. to take him back. (Id. at 492.) Petitioner denied making the 288 calls from his home phone to E.M.'s cell phone (Id.), and claimed that his grandchildren placed those calls. (Id. at 500.) Petitioner further denied being at E.M.'s place of employment other than the one time to collect the bags of clothing which he had demanded be returned to him. (Id. at 496-97.)

Petitioner also firmly denied the allegation relating to the charge of intimidation of a witness/victim. In an effort to discredit his co-worker, Ms. Boyer, Petitioner insinuated that she was untruthful in her testimony because she had been shunned by Petitioner romantically. (N.T., Trial at 488.) Petitioner claimed that it was Ms. Boyer who initiated the conversation by asking "what would you do to get out of that mess." (Id. at 489.) To which, Petitioner responded: "I'd do anything to get out of that mess. . . . I'd even pay off [E.M's] car." (Id.) Petitioner argues that it was Ms. Boyer who made the decision to pass that information on to E.M. through her daughter. (Id.)

19

## III.  Eligibility for PCRA Relief

A petitioner seeking relief pursuant to the PCRA is eligible only if he pleads and proves, by a preponderance of the evidence, that (1) he has been convicted of a crime and is currently serving a sentence of imprisonment, probation or parole for the crime, (2) his conviction has resulted from one or more of the enumerated errors or defects found in § 9543(a)(2) of the PCRA, (3) he has not waived or previously litigated the issues he raises, and (4) the failure to litigate the issue prior to and during trial, or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel. 42 Pa. C.S.A. § 9543(a)(2), (3), (4).

A petitioner has previously litigated an issue if (1) the highest appellate court in which a petitioner could have had review as a matter of right has ruled on the merits of the issue, **Commonwealth v. Spotz**, 616 Pa. 164, 186, 47 A.3d 63, 76 (2012), or (2) the issue has been raised and decided in a proceeding collaterally attacking the conviction or sentence. 42 Pa. C.S.A. § 9544(a); **Commonwealth v. Phillips**, 31 A.3d 317, 320 (Pa. Super. 2011). In this case, the issues contained in the *pro se* and amended petitions have not been previously litigated in the appellate courts.

With respect to claims that have not been previously litigated, a petitioner must also demonstrate that the claims have not been waived. A petitioner has waived an issue if the petitioner could have raised the issue but failed to do so before trial, on appeal, or in a prior state post conviction proceeding. 42 Pa. C.S.A. § 9544(b); **Spotz**, 616 Pa. at 186, 47 A.3d at 76. However, waiver will be excused under the PCRA if

20

petitioner can meet the conditions of 42 Pa. C.S.A. § 9543(a)(3)(ii) or (iii)[19] or by making a showing of ineffective assistance of counsel. **Commonwealth v. Morales**, 549 Pa. 400, 409, 701 A.2d 516, 520 (1997).

In order to prevail on a claim of ineffective assistance of counsel made in the post conviction context, a petitioner must overcome the presumption that counsel is effective by establishing by a preponderance of the evidence that: the underlying claim has arguable merit; trial counsel had no reasonable basis for proceeding as he did; and the petitioner suffered prejudice. *See* 42 Pa. C.S.A. § 9543(a)(2)(ii); **Spotz**, 616 Pa. at 187, 47 A.3d at 76 (*citing* **Commonwealth v. Pierce**, 515 Pa. 153, 158-59, 527 A.2d 973, 975-76 (1987)). The client has the burden of establishing counsel's ineffectiveness because counsel is presumptively effective. Id.

With respect to whether counsel's acts or omission were reasonable, defense counsel is accorded broad discretion to determine tactics and strategy. **Commonwealth v. Fowler**, 447 Pa. Super. 534, 670 A.2d 1153 (1996), *aff'd* 550 Pa. 152, 703 A.2d 1027 (1997). The applicable test is not whether alternative strategies were more reasonable, employing a "hindsight" evaluation of the record, but whether counsel's decision had *any* reasonable basis to advance the interests of the defendant.

---

[19]Section 9543(a)(3) provides:
[T]hat the allegation of error has not been previously litigated and one of the following applies: (i) The allegation of error has not been waived. (ii) If the allegation of error has been waived, the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual. (iii) If the allegation of error has been waived, the waiver of the allegation of error during pretrial, trial, post-trial or direct appeal proceedings does not constitute a State procedural default barring Federal habeas corpus relief.
42 Pa. C.S.A. § 9543(a)(3).

21

**Commonwealth v. Chmiel**, 612 Pa. 333, 361, 30 A.3d 1111, 1127 (2011). The appellate courts will conclude that counsel's chosen strategy lacked a reasonable basis only if the petitioner proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." **Commonwealth v. Williams**, 587 Pa. 304, 312, 899 A.2d 1060, 1064 (2006) (citation omitted).

To establish the prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness. **Chmiel**, 612 Pa. at 362-63, 30 A.3d at 1127-28. "We stress that boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." Id. (*quoting* **Commonwealth v. Paddy**, 609 Pa. 272, 292, 15 A.3d 431, 443 (2011)).

Petitioner has raised issues regarding the ineffective assistance of counsel which have not been waived or previously litigated and, therefore, are subject to review by this Court.

## IV.     Discussion

At the PCRA hearing in this case, Petitioner challenged the effectiveness of his trial counsel in the following four ways: (1) Attorney Walmer failed to call certain witnesses at trial (Amended Petition at ¶ 7(a)); (2) Attorney Walmer failed to hire a private investigator to prove Petitioner's defense claims (Id. at ¶ 7(b)); (3) Attorney Walmer failed to question witnesses pursuant to Petitioner's instructions (Id. at ¶ 7(c));

22

and (4) Attorney Walmer failed to spend sufficient preparation time with Petitioner prior to the trial (Id. at ¶ 7(e)).[20] Following the evidentiary hearing, PCRA counsel requested, and was granted permission, to amend his petition to include the allegations that trial counsel was ineffective for (1) failing to advise Petitioner of the maximum sentences for the offenses charged, and (2) failing to provide pre-trial discovery to Petitioner for his review. (N.T., PCRA at 98-99.)

## A. Failure to Call Certain Witnesses

Initially, Petitioner claims his attorney was ineffective for failing to call certain witnesses at trial. (See Amended Petition at ¶ 7(a).) The standards governing a challenge to trial counsel's assistance for not calling a witness are well settled by the Supreme Court of Pennsylvania:

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements of the **Strickland**[21] test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied

---

[20]The following three challenges raised in Petitioner's amended petition were withdrawn by PCRA counsel at the start of the evidentiary hearing: (1) whether Attorney Walmer was ineffective for failing to object to the testimony of Detective Quinn related to his observations of the victim when he was not qualified as a medical examiner (Amended Petition at ¶ 7(d)); (2) whether Attorney Walmer was ineffective for failing to file a motion for recusal of the trial judge (Id. at ¶ 7(f)); and (3) whether Attorney Walmer was ineffective for failing to file a motion for recusal to permit Petitioner's daughter to testify (Id. at ¶ 7(g)). (N.T., PCRA at 4-5.)

[21]In **Strickland v. Washington**, 466 U.S. 668 (1984), the United States Supreme Court adopted a two-part test for assessing claims of counsel's ineffectiveness: the defendant must prove that (1) counsel's representation "fell below an objective standard of reasonableness," and (2) the defendant was prejudiced by counsel's errors. Id. at 687–88.

23

the defendant a fair trial. . . . To demonstrate **Strickland** prejudice, a petitioner must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case. . . . Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense. . . . A failure to call a witness is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy.

**Commonwealth v. Sneed**, 616 Pa. 1, 22-23, 45 A.3d 1096, 1108-09 (2012) (citations and internal quotations omitted; footnote added). Without providing specific facts to demonstrate the proposed witnesses' availability and willingness to testify, and that the testimony would have been helpful to Petitioner's case, Petitioner fails to state a claim for relief.

At the PCRA hearing, Petitioner testified that trial counsel failed to call the following witnesses at his trial: (1) his daughters, Carisha, Alicia, and Tambra Peters (N.T., PCRA at 17); (2) "Cathy," the victim's upstairs neighbor (Id.); (3) the victim's downstairs neighbor (Id. at 22); (4) Lieutenant Billy from the Lancaster County Prison (LCP) (Id. at 32); (5) Kevin France from LCP (Id. at 33); (6) "Jen" from LCP (Id.); (7) Lieutenant Steinberger from LCP (Id. at 38); (8) Harley Wells from LCP (Id. at 41); (9) the victim's adopted son, Charles M. (Id. at 38, 41); (10) the victim's adopted daughter, Priscilla M. (Id. at 38-39); (11) "Elsa" (Id. at 38); and (12) Petitioner's neighbor, Denise Lentz. (Id. at 42-43.) The record establishes, however, that during the trial Petitioner only identified three witnesses whom he had wanted to call at trial, but counsel had refused. Those witnesses were Lieutenant Billy, Lieutenant Steinberger, and Correctional Officer Jeff Crisner. (N.T., Trial at 236.) To now argue

24

that there were, in fact, over a dozen witnesses Petitioner instructed counsel to call at trial, rather than the three identified for the Court, is disingenuous.

Moreover, merely identifying the witnesses by name and stating that Petitioner thinks they would have contributed to his case does not meet the required burden of proof set forth by our Supreme Court. Likewise, claiming that trial counsel could have compelled the appearance of the witnesses through a subpoena (N.T., PCRA at 38), does not prove that the witness was available to testify for the defense or that the witness was willing to testify for the defense.

Even if Petitioner was able to meet his burden that the witnesses were available and willing to testify, the proffered testimony would not have changed the outcome of the trial. Petitioner claims that licensed practical nurses at LCP, specifically, Kevin France, Harley Wells and "Jen," would have testified to the absence of visible scratches, marks or bruises during their physical examinations of Petitioner, performed within the first week of his incarceration. (N.T., PCRA at 33-34, 41.) Any testimony by these newly identified witnesses in regards to the lack of wounds on Petitioner would not have changed the outcome of the trial because that evidence was already submitted to the jury through Detective Graeme Quinn. (N.T., Trial at 433-34.)

Moreover, the issue of wounds inflicted on Petitioner by the victim was never an issue at trial. The victim did not claim to inflict any kind of scratch or bruise or mark on Petitioner during the sexual attack. (N.T., PCRA at 84.) Rather, she testified that Petitioner overpowered her (N.T., Trial at 190) and threatened to "smash her face" if she resisted. (Id. at 182.) The victim added that the Petitioner was "stronger than [she was], so there was no way [she] could . . . fight him off." (Id. at 120.)

25

The proffered testimony from Lieutenant Billy at LCP that Detective Quinn was "insubordinate" and rough with Petitioner when he was collecting DNA evidence from Petitioner (N.T., PCRA at 32), would have been completely irrelevant at trial. (Id. at 84.) Additionally, testimony from Lieutenant Billy and Lieutenant Steinberger, another Prison official, regarding the amount of time Petitioner was given to review the preliminary hearing transcript in this case in preparation for trial (Id. at 30-31, 33), would only be relevant with regards to this PCRA and would have had no bearing on the trial. (Id. at 83-84.)

Identifying the victim's neighbors as possible witnesses that could testify regarding the incident calling into question the victim's veracity is insufficient to meet Petitioner's burden. Specifically, Petitioner stated that "Cathy" – the neighbor across the hall from the victim – would have testified to the fact that at no time did she ever hear Petitioner arguing or fighting with the victim during their relationship. (N.T., PCRA at 21.) Petitioner, however, also acknowledged that this neighbor had no "knowledge of what occurred the night of this alleged incident." (Id. at 21-22.)

With regard to the unnamed neighbor on the ground floor, Petitioner proffered that she would have testified that there was no loud music playing the night of the assault, as supposedly alleged by the victim. (N.T., PCRA at 21.) Petitioner, however, has mis-characterized the victim's trial testimony. When asked on cross-examination if E.M. had neighbors, she responded that "[t]he people downstairs, they are teenagers and they play their music very, very loud." (N.T., Trial at 183.) Whether these neighbors were or were not playing music at the time of the sexual assault, or were even home, was not established, nor was it relevant. As noted by trial counsel, the

26

victim did not give a statement to the police or testify at the preliminary hearing that she was "fighting violently for her life or yelling or screaming or anything that would have been heard by neighbors." (N.T., PCRA at 74.)

Moreover, Attorney Walmer testified at the PCRA hearing that the Police canvassed the apartment building and the surrounding area for witnesses and could find none.[22] (N.T., PCRA at 86-87.) It was trial counsel's opinion that these neighbors could add nothing to the defense except that perhaps the victim was a bad neighbor[23] (Id. at 86); and, as counsel repeatedly stated, it is never a good defense strategy to attack the character of a rape victim, as it offends the jury. (Id. at 73-74, 85, 97; see also Id. at 96.) Thus, the fact that a neighbor allegedly exists does not show that he or she has relevant testimony or that the absence of that testimony denied Petitioner a fair trial.

Petitioner testified at his PCRA hearing that he sought to introduce the testimony of the victim's adopted children, Charles and Priscilla, to attack the victim's credibility. (N.T., PCRA at 39-41.) Simply identifying these children as possible witnesses without demonstrating their availability and willingness to testify, and that the testimony would have been helpful to Petitioner's case, is insufficient to meet Petitioner's burden. Moreover, this Court cautioned defense counsel during the trial that any proffered

---

[22]Petitioner's contention that these two neighbors "would be crucial witnesses as to what they saw or heard on the evening of the alleged attack" (Petitioner's Memorandum of Law at 10), is belied by the Commonwealth's investigation which suggests that they saw and heard nothing.

[23]Petitioner wished to establish that the victim, E.M., called the landlord often to complain about her neighbors. (N.T., PCRA at 22.)

27

testimony regarding the victim's character for honesty with regards to her adopted children would be subject to a strict offer of proof given its questionable relevancy and admissibility.[24] (N.T., Trial at 32-35; N.T., PCRA at 85.) Trial counsel testified that, aside from being bound by the ruling of the Court on this issue, he thought the proffered testimony was irrelevant and that it would serve no purpose other than to offend the jury. (N.T., PCRA at 85.)

Denise Lentz was proposed by Petitioner as a witness who could verify that the victim was at his residence in Lancaster City in the weeks preceding the sexual assault on February 12, 2010. (N.T., PCRA at 21.) Trial counsel did not question the relevancy of such testimony, just its cumulative nature. (Id. at 86.) At trial, Petitioner's neighbor, Edna Gonzalez, testified to the presence of the victim's car in front of her home during January and February of 2010. (N.T., Trial at 461-62.) Petitioner's daughter, Tambra or "Tammy," also testified to the fact that the victim, E.M., visited her father in February of 2010. (Id. at 471-73.) Accordingly, it was trial counsel's opinion that the additional testimony by Ms. Lentz would not have been helpful to Petitioner's case.

Petitioner further claims that trial counsel was ineffective for failing to call his daughters, Alicia, Tambra, and Carisha Peters, to testify on his behalf. (N.T., PCRA at 17.) During the trial, after the Commonwealth rested, Petitioner identified his daughter, Alicia Peters, as a defense witness. (N.T., Trial at 452-53.) Prior to calling the witness, the Commonwealth asked defense counsel for an offer of proof. (Id. at 448.) Defense

---

[24]Petitioner sought to introduce evidence that the victim, E.M., received government money for her adopted children but neglected to properly care for them. (N.T., PCRA at 39-41, 83; see also N.T., Trial at 34-35.) Specifically, he wanted Priscilla M. to testify to the fact that her mother refused to loan her money and refused to sign for a car loan. (Id. at 39-40.)

28

counsel advised that Ms. Peters intended to testify "that on the evening of February 12[th], that she went to [E.M.'s] apartment with [Petitioner] and with her child, [Petitioner's] granddaughter; and that they were with [E.M.] and [Petitioner] on the evening of the alleged incident . . . [d]uring the time frame in question, after 8:00. The 8 to 9 period." (Id. at 452-53.)

Based upon this offer of proof, I determined that the proposed witness' testimony would directly contradict that of previous Commonwealth witnesses,[25] and defense counsel agreed with that assessment. (N.T., Trial at 455-56.) Accordingly, Alicia Peters was summoned to the witness stand, outside the view of the jury, and warned of the penalties for perjury. (Id. at 457-59.) After receiving this warning, Alicia Peters declined to testify. Defense counsel objected to the Court's instruction to the proposed defense witness as "a form of intimidation." (Id. at 455.) On appeal, the Superior Court ruled that, where the witness was without the advice of counsel and was appearing under a subpoena, it was proper for the Court to inform Ms. Peters of the consequences of perjury when defense counsel made it clear that the substance of Ms. Peters' testimony would squarely contradict several previous Commonwealth witnesses.

Of the remaining two daughters, Tambra Peters did, in fact, testify for her father. (See N.T., Trial at 469-78.) Petitioner suggests that his third daughter, Carisha, would have refuted the victim's testimony that she was not in his home in January or February of 2010. (N.T., PCRA at 20-21.) As noted above, such testimony would have been

---

[25]See, for example, the testimony of E.M. (N.T., Trial at 116-21), A.M. (E.M.'s daughter) (Id. at 243-45), Kassandra Legg (Id. at 288-89), and Gloria Boyer. (Id. at 382, 387.)

29

cumulative as Petitioner's neighbor, Edna Gonzalez, testified to the presence of the victim's car in front of her home during January and February of 2010 (N.T., Trial at 461-62), and Tambra Peters also testified to the fact that the victim visited her father in February of 2010. (Id. at 471-73.) Accordingly, it was reasonable for trial counsel to conclude that the additional testimony by Carisha Peters would not have been helpful to Petitioner's case.

No evidence was offered at the evidentiary hearing as to the identity of "Elsa," her relationship to the case, or the substance of her potential testimony. Thus, the issue of counsel's ineffectiveness for failing to call this witness is waived.

Under the circumstances of this case, counsel will not be found ineffective for failing to call the witnesses identified by Petitioner because Petitioner has failed to show that the witnesses were available and willing to testify for the defense, and that the absence of the testimony of the witnesses was so prejudicial as to have denied Petitioner a fair trial. Accordingly, this claim must fail.

### B. Failure to Hire Private Investigator

Petitioner next claims that Attorney Walmer rendered ineffective assistance by failing to hire a private investigator to prove Petitioner's defense claims. (See Amended Petition at ¶ 7(b).) Jury selection began in this case on January 10, 2011. At that time, Attorney Walmer brought Petitioner's request to hire a private investigator to the Court's attention. Trial counsel indicated that he was comfortable moving forward with the case without the private investigator, but Petitioner wished for his motion to be granted.

30

(N.T., Trial at 43-45.) The Court questioned Petitioner and Petitioner indicated that he would rather proceed to trial than to continue the case. (Id. at 47.)

Nonetheless, Petitioner now claims that, during his second of at least four pre-trial meetings with trial counsel at the Prison, he requested a private investigator be hired to help prepare his defense, and counsel refused. (N.T., PCRA at 26.) It is well settled that

> the [f]ailure of trial counsel to conduct a more intensive investigation or to interview potential witnesses does not constitute ineffective assistance of counsel, unless there is some showing that such investigation or interview would have been helpful in establishing the asserted defense. . . . Moreover, the value of a particular defense or witness' testimony is not judged abstractly in a vacuum; the defendant must sustain his burden of proving how the testimony of the uninterviewed witness would have been beneficial under the facts and circumstances of his case.

Commonwealth v. Pursell, 555 Pa. 233, 259-60, 724 A.2d 293, 306 (1999) (citations omitted). Moreover, a petitioner needs to aver more than a mere assertion that had trial counsel conducted the investigation, it would have been helpful. Commonwealth v. Anderson, 501 Pa. 275, 287, 461 A.2d 208, 214 (1983) (citing Commonwealth v. Pettus, 492 Pa. 558, 563, 424 A.2d 1332 (1981)).

Here, Petitioner claims he requested that trial counsel hire an investigator to interview the victim's neighbors to determine if they heard screaming on the night of the attack or other noise associated with Petitioner dragging the victim up her apartment steps. (N.T., PCRA at 26.) Trial counsel testified at the evidentiary hearing that it was too late to hire an investigator by the time he was hired to defend Petitioner's case. (Id. at 72-73.) Instead he reasonably relied upon the Commonwealth's investigation which, as noted above, included an unsuccessful Police canvas of the apartment building and

31

the surrounding area for witnesses. (Id. at 86-87.) Trial counsel noted, further, that it was not relevant to interview the neighbors of the victim, as there was no evidence of screaming or violent banging, other than the initial scream when Petitioner jumped out of the bushes as the victim was unlocking her door and then quickly covered her mouth. (Id. at 73-74; N.T., Trial at 116.) The trial testimony established that the victim was forced to submit to the assault. (N.T., Trial at 116-19; see also N.T., PCRA at 74.)

Petitioner also wanted trial counsel to engage a private investigator to find out if E.M. had been involved in other relationships while she was dating Petitioner. (N.T., PCRA at 55.) He wanted to bring up the victim's sexual history with other partners, which he claimed was relevant to the charges. (Id. at 54.) Such a claim implicates the Pennsylvania Rape Shield Statute, which provides:

> § 3104. Evidence of victim's sexual conduct
> (a) General rule.- Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa. C.S.A. § 3104(a). Thus, "the Rape Shield Law bars prior instances of sexual conduct *except those with the defendant* where consent of the victim is at issue and the evidence is otherwise admissible." **Commonwealth v. Fink**, 791 A.2d 1235, 1240 (Pa. Super. 2002) (emphasis added). The alleged sexual conduct which Petitioner sought to discover through investigation would not have involved the victim and Petitioner. Therefore, it did not fall within the statutory exception for past sexual conduct with the defendant.

32

Petitioner further testified that he wanted an investigator to interview the victim's employer to determine "what time she left work [the day of the incident], [and] what time she [went] back to work that day." (N.T., PCRA at 27.) The defense at trial was that the victim left work, came to Petitioner's home, had consensual sex with him in an upstairs bedroom, and the victim went back to work. (Id. at 76.) It was trial counsel's opinion that this defense was adequately developed in the record and that a private investigator was unnecessary. (Id.)

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." **Commonwealth v. Peterkin**, 511 Pa. 299, 318, 513 A.2d 373, 382 (1986) (quoting **Strickland v. Washington**, 466 U.S. 668, 690-91 (1984)). See also **Commonwealth v. Johnson**, 600 Pa. 329, 350, 966 A.2d 523, 535 (2009). Trial counsel testified that based upon his professional experience there was no need for a private investigator as this was not a fact-specific case. "This was a case that hinged on Mr. Peters' testimony versus [E.M.]'s." (N.T., PCRA at 94; see also Id. at 82.) Trial counsel's reasonable decision, under the circumstances of this case, must be accorded that heavy measure of deference.

Petitioner failed to establish at his PCRA Hearing that additional evidence was available and helpful to the defense other than that adduced at trial. The "failure to conduct a more intensive investigation, in the absence of any indication that such

33

investigation would develop more than was already known, simply does not constitute ineffective assistance of counsel." **Commonwealth v. Poindexter,** 435 Pa. Super. 509, 523, 646 A.2d 1211, 1217 (1994). Accordingly, Petitioner fails to prove that the outcome of the trial would have been different if a private investigator was hired, since he points to no specific relevant and admissible evidence the investigator would have discovered.

Moreover, I would note that there is no requirement on the part of the Commonwealth to furnish investigative services at the Commonwealth's expense in a noncapital case. **Commonwealth v. Bardo,** 551 Pa. 140, 149, 709 A.2d 871, 875 (1998); **Commonwealth v. Carter,** 537 Pa. 233, 257, 643 A.2d 61, 73 (1994). *See also* **Commonwealth v. Vandivner,** 599 Pa. 617, 648, 962 A.2d 1170, 1188 (2009) ("There is no obligation on the part of the Commonwealth to pay for the services of an expert."). Nor is there a constitutional obligation, either federal or state, to appoint experts at public expense to assist in the preparation of a defense whenever requested by one accused of a crime. **Commonwealth v. Gelormo,** 327 Pa. Super. 219, 227, 475 A.2d 765, 769 (1984).

Petitioner has failed to carry his burden on this ineffectiveness claim.

### C. Failure to Question Witnesses as Instructed

Next, Petitioner contends that trial counsel failed to question various witnesses pursuant to Petitioner's instructions. (*See* Amended Petition at ¶ 7(c).) Nicole Sloan, Petitioner's niece, testified at trial on his behalf. (N.T., Trial at 464-66.) Petitioner

34

stated at his evidentiary hearing that he wanted trial counsel to question Ms. Sloan about an alleged statement made by the victim to Ms. Sloan at their place of employment the day the victim returned to work after the alleged assault. (N.T., PCRA at 18.) The proffered testimony was that the victim told Ms. Sloan "she ha[d] [Petitioner] exactly where she wanted [him], which was in prison." (Id.) Such testimony would have been inadmissible because it is hearsay not within any exception.

Petitioner also sought to have trial counsel question Ms. Sloan regarding her observations of the victim outside of work. Specifically, Ms. Sloan had allegedly seen the victim sitting in a park in the arms of another man who was fondling her. (N.T., PCRA at 19-20.) Such a claim implicates the Rape Shield Statute, 18 Pa. C.S.A. § 3104(a), which, as noted above, "bars prior instances of sexual conduct *except those with the defendant* where consent of the victim is at issue and the evidence is otherwise admissible." Fink, 791 A.2d at 1240 (emphasis added).

At the evidentiary hearing Petitioner additionally argued that trial counsel failed to cross examine the victim regarding the condition of her clothing. (N.T., PCRA at 49-50.) Petitioner claimed that the victim referred to her pants as being "ripped off of her." (Id. at 50.) It was Petitioner's contention that the pants were not physically ripped and, further, that it would have been impossible for them to have been completely removed over the platform sneakers that the victim was wearing at the time of the assault. (Id.)

The victim testified at trial that as Petitioner dragged her off the couch onto the floor, he pulled her pants down and took his pants down. (N.T., Trial at 119.) She specifically denied that the pants were torn or damaged in any way during the assault. (Id. at 120, 175.) On cross examination, defense counsel asked the victim if when

35

Petitioner "pulled [her] pants off, [her] pants and [her] panties came off altogether," to which the victim responded, "yes." (Id. at 174.) Defense counsel then confirmed with the victim that her shoes and socks remained on. (Id. at 174-75.) It is unclear from this testimony if, in fact, the pants and panties were completely removed from the body of the victim. The testimony suggests that the victim's clothing was pulled down, just as Petitioner's pants were pulled down and not entirely removed before the assault. In any event, it is clear from the record that, contrary to Petitioner's assertion, trial counsel did cross examine the victim regarding her statements relative to her clothing.

Petitioner further claims trial counsel should have questioned the victim regarding the alleged damage to her cellular telephone. (N.T., PCRA at 51-52.) At trial, the victim testified that after sitting down on the couch, she reached for her cell phone in her purse to call the police. (N.T., Trial at 117.) Petitioner grabbed the phone and "crushed" it so that the face of the phone was black. (Id. at 117-18.) The Commonwealth presented a photograph of the damaged cell phone at trial. (Id. at 125-26, 127; see also Com. Exs. 5 & 11.) Both the victim, E.M., and her daughter, A.M., testified that the 911 call to the police was made with A.M.'s cell phone (Id. at 179, 245), as E.M.'s phone was damaged and there was no land line at her apartment. (Id. at 117, 179.)

Trial counsel effectively cross examined the victim in this case and placed her credibility at issue for the factfinder. Counsel conducted elaborate questioning during cross examination to support the theory that the sexual contact in this case was consensual. Moreover, counsel conducted extensive questioning into the truthfulness of the Commonwealth witnesses who testified against Petitioner.

36

### D. Failure to Adequately Prepare for Trial

Lastly, it is Petitioner's contention that Attorney Walmer was not adequately prepared for trial. (*See* Amended Petition at ¶ 7(e).) This catch-all argument includes claims of trial counsel's failure to advise Petitioner of the maximum penalties and sentencing guidelines for the offenses charged (N.T., PCRA at 46-47), failure to provide pre-trial discovery to Petitioner for his review (Id. at 35-38), and the general failure to provide Petitioner with sufficient information to make an informed decision about proceeding to trial.

The record establishes that Petitioner was first informed by Attorney Spade in August of 2010 of the maximum penalties he was facing on all of the filed charges. (*See* N.T., Motion to Withdraw Hearing at 9-13.) Petitioner testified that he could not remember if Attorney Walmer discussed potential sentences with him in the weeks leading up to his trial. (N.T., PCRA at 46.) Petitioner did concede that trial counsel discussed the sentencing guidelines with him, although he denied ever being advised of the statutory penalties for each of the charged offenses. (Id. at 47-48.) Trial counsel testified that he reviewed with Petitioner (1) the statutory penalties because of the "incredibly serious" nature of the charges, (2) the fact that Petitioner was facing a five-year mandatory sentence, and (3) the possibility of consecutive sentences. (Id. at 70.) Still, Petitioner made it clear that he wanted to go to trial on the charges. (Id. at 71-72, 95.)

With regard to the alleged failure to provide discovery for his review, Petitioner told the Court on the first day of trial that he had, in fact, received discovery two weeks

37

prior to the start of trial. (N.T., Trial at 45.) Moreover, the record establishes that Petitioner was provided with discovery multiple times. He was first given a copy of discovery by Attorney Spade at the Motion to Withdraw Hearing on August 17, 2010, almost five months before trial.[26] (N.T., Motion to Withdraw Hearing at 27.)

Trial counsel testified at the PCRA Hearing that he thoroughly reviewed the discovery with Petitioner.[27] Trial counsel was aware that Petitioner claimed to be illiterate, despite evidence to the contrary, so counsel sat down with Petitioner and reviewed the discovery with him.[28] (N.T., PCRA at 80-81.) Moreover, Petitioner could not definitely say that trial counsel failed to review the discovery with him. Rather, he could only say that he did not think counsel did. (Id. at 36.) Petitioner, however, then admitted that his trial counsel read to him documents contained in the Commonwealth's discovery, including the victim's statements, the charges, police reports, and the transcript of the 911 call. (Id. at 36-38.) Petitioner further testified that approximately

---

[26]At the hearing on August 17, 2010, Mr. Spade noted for the record that he was "handing over to Mr. Peters the information and complaint on both Docket Numbers, 1874 of 2010 and 1880 of 2010, as well as the discovery, numbering approximately 1 through 95 pages." (N.T., Motion to Withdraw Hearing at 30.)

[27]Petitioner testified that he saw his attorney at least four times in the 31 days between counsel's appointment on December 9, 2010, and the start of trial on January 10, 2011. (N.T., PCRA at 49.)

[28]Petitioner's claim that trial counsel did not give him a copy of the Commonwealth's discovery (N.T., PCRA at 36), may, in fact, be accurate, as trial counsel noted that he could not remember actually giving Petitioner a copy of the discovery because "he really believed [Petitioner] when he said he was illiterate." (Id. at 81.) Attorney Walmer clearly recalls methodically reviewing photographs, other exhibits, the victim's testimony, and witness statements all contained within a "stack of discovery" because of Petitioner's alleged illiteracy. (Id.) Even if Attorney Walmer did not provide a copy of the discovery, Petitioner had already received 95 pages of discovery from Attorney Spade.

two to three weeks prior to trial he received from trial counsel a transcript from the preliminary hearing which he was able to review. (Id. at 30-31, 36.)

Petitioner also claims a general failure on the part of trial counsel to provide him with sufficient information to make an informed decision about proceeding to trial. (See Petitioner's Memorandum of Law at 11.) This argument suggests that Petitioner was improperly induced to go to trial and forego a guilty plea.[29] Petitioner has consistently maintained his innocence throughout these proceedings. To now intimate that he would have been open to pleading guilty if given this information is disingenuous and belies the record of this case. (N.T., PCRA at 72.)

Petitioner testified that Attorney Walmer never discussed a case strategy with him. (N.T., PCRA at 14, 28, 35, 43.) This might be because Petitioner "had the strategy." (Id. at 83.) As explained by trial counsel: "[Petitioner] was basically the lead counsel on this, telling me what to do, how to do it, and when to do it. His strategy was [the victim and Petitioner] had consensual sex in the afternoon; [E.M.] is a liar." (Id.) Trial counsel presented this defense that corroborated Petitioner's version of the incident. The other trial strategy for counsel was "trying to not put the victim in a totally negative light." (Id. at 97) So if trial counsel did not put certain witnesses on the stand, or ask particular questions of witnesses, as requested by Petitioner, it was because counsel did not think it would help Petitioner's case. (Id. at 96.)

---

[29]Petitioner testified that trial counsel never discussed a plea bargain with him. (N.T., PCRA at 45.) Trial counsel testified that, while he was unsure as to whether the Commonwealth actually made an offer for the five-year mandatory minimum, Petitioner "was absolutely not interested" in pleading guilty. (Id. at 95; see also Id. at 71-72.)

39

Petitioner further claims that trial counsel failed to incorporate various facts in the case strategy, including "[Petitioner's] lack of injuries, the condition of the victim's clothes or damage to the victim's cellular telephone." (Petitioner's Memorandum of Law at 10.) Trial counsel did elicit testimony regarding Petitioner's lack of injuries through Detective Quinn. (N.T., Trial at 433-34.) As noted above, there was never any testimony that the victim's clothing was torn. To the contrary, the victim specifically testified that her clothing did not rip. (Id. at 120, 175.) The damage to the cell phone was clearly established by testimonial and documentary evidence, as set forth above. (N.T., Trial at 117-18, 125-26, 127, 179, 245; Com. Exs. 5 & 11.) Therefore, any attempt by trial counsel to deny the damage to the phone would have been disingenuous. Petitioner fails to prove that the outcome of the trial would have been different had trial counsel incorporated these various facts in the case strategy.

With respect to his trial preparedness, Attorney Walmer was appointed 32 days prior to trial. However, trial counsel was an experienced trial attorney with 26 years experience as a criminal lawyer, performing dozens to over a hundred trials, including at least a dozen rape trials. (N.T., PCRA at 67.) It was Petitioner's actions of requesting to represent himself on August 17, 2010, and his failure to hire an attorney with his looming trial date that created the time limitations for trial preparation in this case. Despite this fact, Attorney Walmer was prepared for trial. (Id. at 87.) He testified that although this was not an easy case, it was a straight forward case. (Id. at 82.) Petitioner did not want a continuance nor did he ask trial counsel to request a continuance after his appointment on December 9, 2010, just 32 days before the scheduled trial date. (Id. at 25, 43; see also Id. at 72-73.)

40

## V. Conclusion

For the reasons set forth above, Petitioner Brett Martin Peters' amended petition for post conviction collateral relief must be denied.

Accordingly, I enter the following:

41

# IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
# C R I M I N A L

COMMONWEALTH OF PENNSYLVANIA :

           v.              :         Nos. 1874-2010 and 1880-2010

BRETT MARTIN PETERS      :

## O R D E R

AND NOW, this 17th day of March, 2014, upon consideration of Brett Martin Peters' amended petition for post conviction collateral relief, and after an evidentiary hearing in this matter, and the filing of briefs by the parties, it is hereby ORDERED that said petition is DENIED.

Pursuant to Pa. R.Crim.P. 908(E), this Court advises Petitioner that he has the right to appeal from this Order. Petitioner shall have 30 days from the date of this final Order to appeal to the Superior Court of Pennsylvania. Failure to appeal within 30 days will result in the loss of appellate rights.

I certify this document to be filed in the Lancaster County Office of the Clerk of the Courts.

BY THE COURT:

Joshua G. Parsons
Clerk of the Courts
ATTEST:

DAVID L. ASHWORTH
JUDGE

Copies to:   Amber L. Czerniakowski, Assistant District Attorney
Michael E. McHale, Esquire, 53 North Duke Street, Suite 1, Lancaster, PA 17602
Brett M. Peters, #KA-5180, SCI Benner Township, 301 Institution Drive, Bellefonte, PA, 16823 – Certified Mail